[No. A057720. First Dist., Div. Two. Oct. 5, 1993.]

AMERICAN MOTORISTS INSURANCE COMPANY, Plaintiff and Respondent, v.
ALLIED-SYSCO FOOD SERVICES, INC., Defendant and Appellant.

1344

**COUNSEL**

Heller, Ehrman, White & McAuliffe, William J. Carroll, Michael E. Dickstein, Robyn M. Lipsky, Arnall, Golden & Gregory, Debra G. Buster, Allen I. Hirsch, Banchero & Lasater and E. Jeffrey Banchero for Defendant and Appellant.

Boornazian, Jenson & Garthe, David J. Garthe and Robert A. Ballard for Plaintiff and Respondent.

**OPINION**

**PHELAN, J.**—Allied-Sysco Food Services, Inc. (Allied-Sysco) appeals from a judgment awarding American Motorists Insurance Company (AMICO) $55,376.27 in a declaratory relief action in which the court found

coverage under Allied Sysco's excess policy for humiliation damages resulting from sexually discriminatory hiring practices. Allied-Sysco asserts that the trial court erred in not also finding coverage under the discrimination portion of the policy, and that it miscalculated the damage award to Allied-Sysco, particularly the allocation of settlement and deferred costs and the application of the retention amounts (deductibles). AMICO cross-appeals, arguing the court erred in finding coverage for humiliation damages. We conclude as a matter of law that the excess policy did not provide coverage under either provision raised herein, and that the court erred in awarding AMICO reimbursement for a portion of attorney fees it paid to Allied-Sysco.

## FACTS AND PROCEDURAL SUMMARY

Allied-Sysco operates a food distribution business. In December 1987, Debbie Ferrill, an applicant, and Catherine Goulart, a prospective applicant for employment, filed a class action suit (the Goulart suit) against Allied-Sysco alleging that its hiring practices were intentionally designed and/or had the practical effect of unlawfully discriminating against women in violation of the Fair Employment and Housing Act (FEHA) codified in Government Code section 12940 et seq. In addition to compensatory damages, the suit sought damages for "humiliation, anguish, embarrassment and emotional distress" caused by Allied-Sysco's conduct. The trial court certified the class as of November 20, 1985.

Beginning in June 1985, Allied-Sysco was insured under combination automobile-general liability policies with AMICO (the primary policies). It also had excess coverage with AMICO under a comprehensive catastrophe liability policy (the excess policies).

In March 1988, Allied-Sysco tendered the defense of the Goulart suit to AMICO based on its primary policies. AMICO accepted the defense subject to a reservation of rights should it subsequently decide to deny coverage. The law firm of Heller, Ehrman, White & McAuliffe, whom Allied-Sysco had originally retained, continued to defend it. While the Goulart suit was pending, AMICO paid the Heller law firm $188,391.40 in defense costs. In June 1988, AMICO wrote Allied-Sysco that "it appeared" there was no coverage under its primary policies. Allied-Sysco notified AMICO in July of its additional responsibility as the excess carrier.

In March 1989, AMICO filed a verified complaint for declaratory relief and reimbursement, and Allied-Sysco filed a cross-complaint for declaratory judgment. While this suit was pending, Allied-Sysco settled the Goulart suit and a consent decree was filed. As part of the settlement, Allied-Sysco was

required to advertise for qualified women applicants to fill its positions, pay the named plaintiffs a total of $75,000 as compensatory damages (60 percent of which is deemed to be for emotional distress), set up a $775,000 compensation fund to provide for the claims of the class members, pay attorney fees for class counsel, and publish newspaper notices describing the claims procedure. Allied-Sysco's attorney fees for defending the case and negotiating the settlement were claimed to total $663,617.60.

The declaratory relief action was tried in two phases and a statement of decision was issued. Phase I dealt with the coverage issues. The trial court found no indemnity under the primary policies, which did not cover mental anguish. The court then addressed whether coverage existed under the excess policies, which provided indemnity for damages, direct and consequential, "because of personal injury . . . caused by or arising out of an occurrence . . . ." "Personal injury" is defined as: "(a) bodily injury, shock, sickness or disease (including death, mental anguish and mental injury resulting therefrom); (b) injury arising out of false arrest, false imprisonment, wrongful eviction, wrongful entry, wrongful detention or malicious prosecution; or (c) injury arising out of *racial or religious discrimination* . . . ; or (d) injury arising out of libel, slander, defamation of character, *humiliation* or invasion of right of privacy unless such injury arises out of advertising activities." (Italics added.)

The court rejected Allied-Sysco's argument that subdivision (c), referring to racial or religious discrimination, was ambiguous and should be interpreted to encompass all types of employment discrimination proscribed by title VII of the 1964 Civil Rights Act, and it concluded that the term should not be read to include sexual discrimination. It found, however, coverage for humiliation damages under subdivision (d), rejecting AMICO's argument that these damages were recoverable only if they stemmed from one of the other torts named in that subdivision.

In phase II, the court determined the damages. The court reiterated that coverage existed for damages for humiliation, and concluded that Allied-Sysco was entitled to a defense. It further found that AMICO had not withdrawn from the defense. The court then proceeded to calculate damages.

First, the court determined that, in the absence of precise proof, 60 percent of the damages was attributable to emotional distress, and that 50 percent of that amount would be allocated to humiliation damages (i.e., 30 percent of the total damages of $890,000, amounting to $267,000).

Second, the court found that the excess policies covered only two of the three and one-half years during which the sexual discrimination occurred.

Thus, the $267,000 recoverable by Allied-Sysco was multiplied by this fraction, reducing the recovery to $139,714. The court then spread the recovery between the two years and took into consideration the deductibles for the policies for those two years ($25,000 and $250,000, respectively). It excluded recovery for the newspaper advertising costs ($21,603.46) and for attorney fees associated with these costs ($296,301.94), finding that the advertising was linked to the discrimination claims, which were not covered by the policy.

On the subject of attorney fees, the court stated that Allied-Sysco's attorneys had not acted as *Cumis* counsel (*San Diego Federal Credit Union* v. *Cumis Ins. Society Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913]) within the meaning of Civil Code section 2860. It went on to explain that in "the absence of more precise proof, and in recognition of the fact that much of their work was done on non-covered issues," it would exercise its discretion and find AMICO liable to Allied-Sysco for 30 percent of the fees—i.e., the same percentage applied to the indemnity portion of the Goulart judgment. This amounted to a recovery of $176,315.98. After all the math was done, the court determined that Allied-Sysco should recover $133,015.13. Although the coverage issue had been decided in Allied-Sysco's favor, the court deducted this figure from the sum of $188,391.40, which AMICO had already paid toward defense costs and awarded AMICO the difference of $55,376.27.

## DISCUSSION

### I. *Duty to Indemnify*

#### A. *Sexual Discrimination*

■ Allied-Sysco argues that the trial court erred in restricting indemnity to damages for humiliation, and that it should also have found coverage for the sex discrimination component of the Goulart suit. It claims that "simple common sense" dictates that the policies' reference solely to racial and religious discrimination was "but a shorthand description for all Title-VII type claims."

1.

First, Allied-Sysco cites cases holding courts must construe insurance policies expansively in favor of coverage and in a manner that meets the reasonable expectations of the insured. (*Poland* v. *Martin* (9th Cir. 1985) 761 F.2d 546; *Hanson* v. *Prudential Ins. Co. of America* (9th Cir. 1985) 783 F.2d

762.) It concludes that Allied-Sysco could not possibly have intended to insure against only two types of discrimination.

The California Supreme Court has recently clarified the rules interpreting allegedly ambiguous insurance policies. In *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254 [10 Cal.Rptr.2d 538, 833 P.2d 545], the court cautioned against the rule of construing terms against the insurer "too early in the interpretive process." (*Id.* at p. 1264.) It stated: "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.]" (*Id.* at pp. 1264-1265.)

"In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context with regard to its intended function in the policy. [Citation.] This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citations.]" (*Bank of the West* v. *Superior Court*, *supra*, 2 Cal.4th at p. 1265, italics in original.)

We find, as did the trial court, that the language of subdivision (c) is clear and unambiguous. It specifically lists the types of discrimination covered. It cannot be read to incorporate expanded coverage for all types of discrimination. We reject Allied-Sysco's argument that "the terms 'racial and religious discrimination' often stand generically for Title-VII type actions."[1]

---

[1] Allied-Sysco attempts to garner additional support for this argument in the title and opening sentence of an insurance treatise. Quoting Magarick on Excess Liability (3d ed. 1989) section 12.07, its brief states, "For example, in a treatise on insurers' liability, whereas the title of the chapter referred in shorthand fashion only to '*Racial or Religious* Prejudice or Defamatory Comments,' the text begins with the sentence: 'In this day and age, it seems obvious that any indication of *racial, religious, or other general and unjustified prejudice. . . .*'" (Italics in original.) We find this argument unpersuasive.

## 2.

We are also unpersuaded by Allied-Sysco's argument that some policies (including AMICO's New York State version of its excess policy) use the term "racial and religious discrimination" as an exclusion, and that if the tables were turned, AMICO would be arguing sex discrimination was an exclusion. We do not have that issue before us, nor do we find this logic compelling.

## 3.

Similarly we find unpersuasive Allied-Sysco's citation to testimony by AMICO's national accounts underwriter that he could not explain why AMICO insured only against racial and religious discrimination, and he did not know whether sexual discrimination was intentionally omitted. Allied-Sysco asserts that this testimony shows "the only rational construction of the excess policy is that it affords coverage for discrimination in general." We cannot speculate from this evidence that the intent of the parties was to insure against discriminatory conduct beyond the types specifically mentioned.

## 4.

Finally, we reject Allied-Sysco's argument that AMICO's failure to send a reservation-of-rights letter regarding the excess policies suggests it believed it owed Allied-Sysco coverage under subdivision (c). AMICO's silence on this matter cannot be held against it, particularly in light of the fact that it subsequently filed a declaratory relief action arguing no coverage existed.

### B. *Damages Arising Out of Humiliation*

In its statement of decision, the court concluded that the term "humiliation" is ambiguous, and that recovery for humiliation damages is not restricted to damages only from the torts contained in that section, i.e., libel, slander, etc. In its cross-appeal, AMICO argues that read "in context," the policy's coverage for damages arising out of "humiliation" is limited to those cases in which humiliation damages arise out of the types of torts in which it is grouped—i.e., libel, slander, defamation of character, and invasion of the right to privacy. AMICO further asserts that here the injuries did

not arise out of humiliation" as stated in the policy, but were due to alleged discriminatory practices. We agree.

### 1.

The trial court's interpretation does not withstand scrutiny. First, the effect of that ruling created indemnity for humiliation damages arising out of a noncovered risk—sexual discrimination. As we have discussed, the policy cannot be construed to cover claims for sexual discrimination. It necessarily follows that the insured cannot expect indemnification for damages, humiliation or otherwise, arising out of that noncovered risk.

Secondly, the court erred when it defined the term "humiliation" outside of its context within the policy contrary to the rule announced in *Bank of the West, supra,* 2 Cal.4th at page 1265:[2] "The court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because *'language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.'* [Citations.]" (Italics in original.)

The policy covered all damages, direct and consequential, due to "personal injury." Personal injury was grouped into four subdivisions. Each subdivision included similar types of injuries or tortious conduct. Subdivision (d) provided indemnity for injuries arising out of the following wrongful acts: "libel, slander, defamation of character, humiliation, or invasion of right of privacy." Interpreting the term "humiliation" in this context, it is not reasonable to conclude that AMICO insured against humiliation damages in the abstract, but rather in relation to the class of torts in which it was placed— i.e., torts dealing with injuries to character and reputation. (See *Waranch v. Gulf Insurance Co.* (1990) 218 Cal.App.3d 356, 361 [266 Cal.Rptr. 827] [the court construed all torts in the same subdivision as part of the same class of conduct].) We conclude that the policy did not indemnify Allied-Sysco for humiliation damages from noncovered risks. Instead, the phrase "arising out of humiliation" must be interpreted to refer to wrongful conduct which is humiliating.

In this regard, we are unaware of a separate, actionable tort of "humiliation" recognized in this state, and we do not intend to create a new cause of action. Nevertheless, we are obliged to give meaning to this coverage term.

---

[2] As AMICO points out, it is unclear from the decision whether the trial court found subdivision (d) to be ambiguous. The decision states, "Ambiguity, if any, in that provision must be resolved in favor of the insured."

To do so, we must interpret the term in the context of this policy according to its ordinary and popular meaning. (See *Bank of the West, supra,* 2 Cal.4th at p. 1265.) Applying these principles, we conclude that humiliating conduct falls within the sphere of several recognized torts that are designed to protect a person's interest in his or her reputation, dignity, and character. (See *Waranch, supra,* 218 Cal.App.3d at p. 361 [torts listed in the libel and slander subsection protect a person's reputation].)

The dictionary defines "humiliate" as: "to reduce to a lower position in one's own eyes or others' eyes: Mortify." Humiliating is defined as "extremely destructive to one's self-respect or dignity: Humbling." (Webster's New Collegiate Dict. (9th ed. 1987) p. 587.) Viewed in this context, a cause of action based on humiliating conduct is included within the defamatory torts of libel and slander—the false and unprivileged utterance or publication which tends to injure the plaintiff in his personal or professional reputation. (See Civ. Code, § 44 et seq.; e.g., *Megarry* v. *Norton* (1955) 137 Cal.App.2d 581, 582-583 [290 P.2d 571] [a sign proclaiming "Nuts to You—You Old Witch," exposed plaintiff to contempt and ridicule].)

Humiliating conduct may also take the form of a malicious utterance which, although not false, holds the plaintiff up to shame or abuse. In this sense the tort is contained within the cause of action for the public disclosure of a private fact. (See *Diaz* v. *Oakland Tribune, Inc.* (1983) 139 Cal.App.3d 118, 126 [188 Cal.Rptr. 762] [degrading a person by laying her private life open to public view].)

Thus, humiliating conduct can be seen to be incorporated in any and all of the causes of action mentioned above. We interpret the coverage for the wrongful act of "humiliation" to be adequately addressed by the more familiar torts enumerated above. In light of this discussion, we conclude that subdivision (d) of the policy covers character and reputation torts which may have at their cores humiliating conduct, and it does not provide indemnification for humiliation damages from whatever source they may flow. Accordingly, we reject the trial court's determination that humiliation damages are recoverable even from sexual discrimination—a noncovered risk.

2.

We also reject Allied-Sysco's contention that coverage existed because the complaint alleged damages "for humiliation." The policy covers damages for injuries "arising out of humiliation," as we have defined the term above. The prayer sought humiliation damages arising out of a cause of action for gender discrimination. The prayer seeking damages "for humiliation" is *not* synonymous with a cause of action "arising out of humiliation."

Allied-Sysco erroneously equates the relief sought with the theory of recovery, and we reject that contention. The underlying complaint simply did not state a cause of action for humiliation. The third party plaintiffs did not plead facts alleging damage to reputation or defamation or disparaging statements. (See, e.g., *Omark Industries* v. *Safeco Ins. Co. of America* (D.Ore. 1984) 590 F.Supp. 114, 120-121 [complaint charging gender discrimination did not allege defamation-type conduct and employer was not covered under its liability policy]; accord, *Hamlin* v. *Western Nat. Mut. Ins. Co.* (Minn.Ct.App. 1990) 461 N.W.2d 395, 398 [same]; *Nichols* v. *American Employer's Ins. Co.* (1987) 140 Wis.2d 743 [412 N.W.2d 547, 549] [same].)

Absent a finding of coverage for either sexual discrimination or humiliating conduct, AMICO cannot be held liable for Allied-Sysco's settlement costs. (*Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553, 562-563 [91 Cal.Rptr. 153, 476 P.2d 825].)

## II. *Duty to Defend*

■ Allied-Sysco's contentions that it is entitled to reimbursement of its attorney fees are wholly dependent on a finding that AMICO had a duty to defend the underlying lawsuit. Since we conclude as a matter of law that there was no potential for coverage under either claim for gender discrimination or humiliating conduct, it necessarily follows that AMICO had no duty to defend.

■ A liability insurer has a duty to defend a suit that potentially seeks damages within the coverage of the policy, or when the insured was led reasonably to expect such defense. (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) This duty is broader than the duty to indemnify, and may attach even in an action in which no damages ultimately are awarded. (*Horace Mann Ins. Co.*, *supra*, at p. 1081; *State Farm Mut. Auto. Ins. Co.* v. *Longden* (1987) 197 Cal.App.3d 226, 232-234 [242 Cal.Rptr. 726].) The existence of a potential for liability is determined from the facts learned by the insurer, either as pleaded in the complaint, or from extrinsic sources. (*B & E Convalescent Center* v. *State Compensation Ins. Fund* (1992) 8 Cal.App.4th 78, 92 [9 Cal.Rptr.2d 894]; *Devin* v. *United Services Auto. Assn.* (1992) 6 Cal.App.4th 1149, 1157 [8 Cal.Rptr.2d 263].) This duty is measured at the *outset* of the litigation. (*Devin*, *supra*, at p. 1157.) "Once the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action,

both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. [Citations.]" (*Horace Mann Ins. Co.*, *supra*, 4 Cal.4th at p. 1081.)

### 1.

■ Here, the only facts presented to the trial court regarding Allied-Sysco's alleged wrongful conduct were contained in the underlying complaint. Since the question of AMICO's duty to defend did not arise from disputed facts, it is a question of law to which we apply our independent judgment. (E.g., *State Farm Mut. Auto. Ins. Co.* v. *Longden*, *supra*, 197 Cal.App.3d at pp. 233-234 [a question of law existed whether the undisputed facts constituted an "accident" during the policy period].)

The underlying complaint alleged facts showing only a pattern of gender discrimination in violation of FEHA, which we have determined was not covered under the liability policy. Since there was no potential for coverage for such wrongful conduct as a matter of law, there was no duty to defend the gender discrimination action. (See *Devin* v. *United Services Auto. Assn.*, *supra*, 6 Cal.App.4th at pp. 1158-1160 [third party complaint for economic damage was not covered by liability policy indemnifying against injury to tangible property]; *Nichols* v. *Great American Ins. Companies* (1985) 169 Cal.App.3d 766, 776-777 [21 Cal.Rptr. 416] [allegation of piracy of premium cable signals was intentional act and was not an accidental "occurrence" as defined in the policy].) Because we find no ambiguity in the policy language, Allied-Sysco had no reasonable expectation of a defense. (See *B & E Convalescent Center* v. *State Compensation Ins. Fund*, *supra*, 8 Cal.App.4th at pp. 99-102.)

### 2.

Nor can this complaint be broadly interpreted to allege facts supporting a separate cause of action for humiliating conduct. (See *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at pp. 276-277 [the defense obligation of the insurer is not limited to the precise theory announced in the third party pleading].) As discussed above, the complaint pleaded facts alleging only a cause of action for gender discrimination. The complaint made no allegation that the insured uttered or published anything which could arguably be interpreted as revealing private facts or making defamatory remarks which exposed the third party plaintiffs to hatred, ridicule, or injury to their reputations, dignity, or character. The allegation that plaintiff Goulart was told by Allied-Sysco's receptionist that women were not hired for warehouse

work because they could not perform the heavy lifting required of the job, does not constitute an invasion of plaintiff's interest in her privacy, or an affront to her reputation and character. While we certainly condemn the type of discrimination alleged here, the pleadings did not bring this conduct within the scope of any of the torts listed in subdivision (c), and Allied-Sysco had no reason to expect a defense.

We conclude that AMICO had no duty to defend, and that Allied-Sysco is not entitled to payment of its defense costs. That portion of the judgment awarding Allied-Sysco a part of its defense costs is reversed.

### III. *Reimbursement of AMICO's Defense Costs*

Because we conclude that AMICO's excess policies did not provide coverage for Allied-Sysco's claim, we must determine if AMICO is entitled to reimbursement of $188,391.40 it paid for Allied-Sysco's defense. The parties touch on this issue in their briefs in reference to whether the trial court properly "credited" this amount against Allied-Sysco's judgment.

*Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308 [241 Cal.Rptr. 427] explains the theories behind reimbursement: "[A]ppellate courts have affirmed judgments in which insurers were reimbursed for attorneys' fees paid in defending insureds against claims for which there was no obligation to defend. . . . [¶] A review of the law on the subject reveals two possible theories for recovery of litigation costs. One is equitable restitution. The other is an agreement or understanding between the parties that the insured would reimburse the insurer for litigation costs should the coverage issues be adjudicated in the insurer's favor." (*Id.* at p. 1322, citations omitted.)

The court explained the basis for the latter theory: "It has been held that an insurer who had no duty to defend was not entitled to reimbursement of litigation costs where the record did not reflect an *understanding* that the insured would reimburse the insurer if the insurer eventually decided not to defend." (*Insurance Co. of the West* v. *Haralambos Beverage Co., supra,* 195 Cal.App.3d at p. 1323, italics added.)

AMICO argues that its reservation-of-rights letter created such an understanding, and cites two cases (*Omaha Indem. Ins. Co.* v. *Cardon Oil Co.* (N.D.Cal. 1988) 687 F.Supp 502 [*Cardon Oil*]; *Walbrook Ins. Co. Ltd.* v. *Goshgarian & Goshgarian* (C.D.Cal. 1989) 726 F.Supp. 777 [*Walbrook*]) in which such letters were held to be sufficient.

Allied-Sysco argues that because AMICO had a duty to defend, it is not entitled to rely on either of these theories. It goes on to assert that even if

AMICO did not have a duty to defend, it is not entitled to reimbursement because the reservation of rights letter did not create the requisite "understanding." We agree with this latter proposition.

AMICO's letter to Allied-Sysco did not create the necessary contractual understanding. It was the third letter sent to Allied-Sysco regarding the Goulart suit, and the only one to mention a right to reimbursement. As Allied-Sysco points out, this letter was sent *after* AMICO had already begun to pay defense costs.

The letter provided: "For the time being, the Company will agree to defend reserving the right to seek reimbursement of defense costs in the event it were to be ultimately determined that there is no duty to defend and *subject to the insured's agreement to such a reservation.*" (Italics added.)

It is evident that AMICO premised the reimbursement not only on a finding that it had no duty to defend, but also on the insured's express agreement to the reservation of right to seek reimbursement. There is no showing that Allied-Sysco agreed to this arrangement.

In both *Walbrook* and *Cardon Oil*, *supra*, cited by AMICO, the federal district courts applied California law which recognizes the insurer's right to make a unilateral reservation of rights, and the insured's nonqualified acceptance of the defense is deemed to be acquiescence. (*Walbrook*, 726 F.Supp. at p. 782; *Cardon Oil*, 687 F.Supp. at p. 505.) The reservation of rights letters in both cases expressly reserved the insurer's right to recover defense costs without conditioning it upon the insured's approval. Thus, the courts could reasonably conclude that by accepting the defense, the insured impliedly agreed to the reservation.

In contrast, AMICO's letter expressly conditioned reimbursement upon Allied-Sysco's approval, which was not forthcoming. Under these circumstances, no agreement to reimburse AMICO existed and the judgment awarding it attorney fees was improper. The award of $55,376.27 is reversed.

### CONCLUSION

That portion of the judgment finding that there is no coverage for gender discrimination is affirmed. The award representing indemnity for humiliation damages and partial defense costs to Allied-Sysco and the reimbursement award to AMICO of $55,376.27 are each reversed. The parties will bear their own costs on appeal.

Kline, P. J., and Benson, J., concurred.